IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANNETTE JOHNSON    :  CIVIL ACTION
           :
    v.      :
           :
ST. LUKE'S HOSPITAL   :  NO. 06-3417

MEMORANDUM

Dalzell, J.          October 23, 2007

   Plaintiff Annette Johnson in this action sues her former employer, St. Luke's Hospital, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. Johnson, an African-American woman, alleges that St. Luke's fired her because of her race.

   St. Luke's has moved for summary judgment. We shall grant St. Luke's motion because Johnson fails to establish either a prima facie case or that St. Luke's official reason for her termination was a pretext for invidious discrimination.

## I.  Factual Background

   On November 28, 2000, St. Luke's Hospital hired Annette Johnson as a personal care assistant in the personal care services department. Def.'s Mem. Ex. 1. Johnson had no problems with her supervisor, Peter Derringer, or with any of her co-workers in the personal care service department, and asserts no claims against St. Luke's arising from any events that occurred

while working in that department.  Id. Ex. 19 (hereinafter
Johnson Dep.) at 17, 19.

     Johnson later applied for the job of phlebotomist, and
St. Luke's hired her in this capacity on February 25, 2002.  Id.
Ex. 3.  Marie Koehler conducted Johnson's interview, and made the
decision to hire her.  Id. Ex. 21 (hereinafter Koehler Dep.) at
9.  Koehler became Johnson's direct supervisor.  Id.  At no time
did Johnson have personal knowledge of Koehler's disciplinary
decisions about other employees in the phlebotomy lab.  Johnson
Dep. at 64.

     Johnson actually started working in the phlebotomy
department on March 5, 2002.  Def.'s Mem. Ex. 2.  Other than two
corrective action reports[1] relating to three instances of Johnson
mislabelling blood specimens, the record reflects no problems

---

     [1]  At St. Luke's Hospital, which is based in Bethlehem,
Pennsylvania, workplace issues warranting official, memorialized
reprimands are written up in corrective action reports.  Def.'s
Mem. Ex. 31 ¶ 10.  There are four grades of corrective action:
(1) first warning, (2) second warning, (3) third warning, and (4)
suspension.  E.g., id. Ex. 4.  After the third warning the
employee in question is placed on probation.  Id. Ex. 31 ¶ 10. If
a supervisor writes up the employee again while he or she is
still on probation, that employee is then suspended and may be
terminated without further warnings.  Id.  Corrective action
report forms have a space for the supervisor to select effective
dates for the corrective action.  See id. Ex. 4, 5, 10, 11, 16,
22, 24, 25, 29.  The typical effective dates seems to be three
months.  Id.

between Johnson, her supervisor, or her co-workers.  Id. Ex. 4,
5.  Johnson admitted she made the labelling errors that Koehler
recorded in these two corrective action reports.  Johnson Dep. at
51-53.  Johnson stated she did not believe that racial animus
motivated those write ups.  Id.

In Johnson's performance evaluation covering the period
from March of 2002 to March of 2003, Koehler noted that although
Johnson initially had some errors with labelling, she had not had
any difficulty in several months.  See Pl.'s Mem. Ex. A.  Koehler
commented that Johnson needed to work on interactions with her
co-workers, and that she is "recognized as willing to assist
coworkers, however, the manner of approach has been interpreted
negatively."  Id.  Im sum, Koehler recommended Johnson for a pay
step increase.

In response to the evaluation, Johnson wrote in the
employee comment section that "[t]he matter of negatively
assisting coworker has been interpreted wrong [sic].  I feel it
did not matter how I handeled [sic] the situation it would have
been interpreted negatively."  Id.  Johnson also wrote that her
signature on the evaluation acknowledged the existence, but not
the correctness, of Koehler's evaluation.  Id.

All was quiet in St. Luke's phlebotomy department until

3

late January, 2004 when Johnson had an altercation with her white co-worker, Aly Suriano.  Apparently, Suriano called Johnson a "bitch" in front of other co-workers and some patients.  Johnson Dep. at 24; Def.'s Mem. Ex. 6.  Johnson talked with Koehler about this incident, but Koehler told her to forget it or "it would come back to haunt [her]."[2]  Johnson Dep. at 22.

According to Johnson, during this meeting Koehler brought up four unrelated issues involving Johnson: (1) Johnson walked "back and forth continuously to the break room . . . constantly eating", (2) she performed a procedure for which she

---

[2]  The record reveals some uncertainty about when Koehler allegedly said this to Johnson, as well as about the exact chronology of events.  Documentary evidence suggest one specific chronology, while Johnson's deposition testimony suggests another.  Id. Ex. 1-18; Johnson Dep. at 22-27. For example, in her deposition Johnson discusses an incident with Aly Suriano in which Suriano allegedly called Johnson a "bitch" and that Johnson mentions in reference to a question about an incident in January, 2004.  Johnson Dep. at 22.  However, she brings up matters that the documentary evidence would place in June and September, 2004 Compare Johnson Dep. at 24-25 and Def.'s Mem. Ex. 6, 10, 11. Johnson never contests the chronology based on the documentary evidence, nor does that chronology undermine Johnson's sequencing of events.  Thus, when Johnson's deposition testimony and the documentary evidence chronologies are in conflict, the latter version of the chronology is presented here.  Otherwise, we present the events hereafter as consistent as possible with both the deposition testimony and documentary evidence, and in the light most favorable to the non-moving party, i.e. Johnson.  All other discrepancies between the parties' factual accounts have been resolved in favor of Johnson.

had not been trained, (3) she improperly performed a procedure that resulted in a co-worker being stuck "with the exposed, contaminated needle" that came out of a child's arm, and (4) she mislabelled a specimen.  Def.'s Mem. Ex. 6.  Johnson wrote a rebuttal to all four issues that Koehler mentioned, and in each instance maintained that she had done nothing wrong.  Id. Koehler did not write up a corrective action report that related to any of these four issues.  Id.

          Johnson stated that Koehler took no action with respect to this name-calling incident.  Johnson Dep. at 22.  However, in a February 17, 2004 note, Koehler wrote that during a conversation the week before she gave Suriano a verbal warning for calling Johnson a "moron," and explained that if it ever happened again Koehler would write up a corrective action report. Def.'s Mem. Ex. 8.

          On March 8, 2004, Koehler gave Johnson a performance evaluation for the prior year.  Id. Ex. 9. Koehler noted several problems with procedures and training, i.e., that Johnson failed to fill certain lavender tubes properly, and took more time than usual to be trained in various areas.  Id.  Koehler noted that Johnson was progressing, however, and recommended a pay step increase.  Id.  Johnson's written rebuttal questioned Koehler's

negative comments, and noted that Johnson made no more mistakes than any other phlebotomist in the department.  Id.

In the same evaluation, Koehler also recorded that Johnson had issues working in a team with her co-workers.  Id. Specifically, Koehler noted that Johnson was having problems communicating effectively and positively with her co-workers, and needed to try harder to "seek assistance positively."  Id.

The tension between Johnson and Suriano escalated in June of 2004.  On June 14, 2004, Suriano again called Johnson an "inappropriate name," this time in front of a patient.  Id. Ex. 10.  Johnson complained to Koehler, and the next day Koehler and Cindy McKellin, Koehler's manager, met with Johnson and Suriano, though it is not clear from the record whether it was separately or together.  Id. Ex. 10, 22; Johnson Dep. at 26.  Koehler discussed the incident with each of them, and explained that Johnson and Suriano were expected to act "appropriately and respectfully" and "another incident would result in corrective action."  Id. Ex. 10, 22.  During this meeting, Johnson also complained that another employee, Daisy Morales, was loud, rude, snappy, and prone to screaming.  Johnson Dep. at 70-71.  McKellin and Koehler denied that this was the case, and stated that if it were true, someone else would have complained.  Id.

Johnson and Suriano had another confrontation the next day, and on June 18, 2004, Koehler wrote up a corrective action report on each of them that placed Johnson on first warning and Suriano on second warning[3].  Def.'s Mem. Ex. 10, 22,

On September 24, 2004, Johnson and Suriano collided again.  Id. Ex. 11.  According to Johnson, as Suriano was coming back with a handful of specimens, Johnson requested that Suriano give her the labels for her patients.  Id.  Suriano repeatedly told Johnson to move, and did so rudely and in a loud tone of voice. Id.  Koehler wrote another corrective action report on both Suriano and Johnson related to this event, which recorded that Johnson had spoken loudly in violation of St. Luke's work rules, and that "[t]his incident demonstrates a continued pattern of unacceptable behavior."  Id.

The phlebotomy department then seemingly fell into a state of relative calm.  The record reflects no instances of interpersonal trouble or corrective action reports involving Johnson for almost a year.  It would appear, however, that the tension between Johnson and St. Luke's remained just below the surface.  McKellin, the lab administrator, warned Johnson about

---

[3]  Suriano was already at the first warning stage because of a prior, unrelated incident.  Def.'s Mem. Ex. 22.

eating in the phlebotomy prep area, and explained that if she did it again McKellin would write up a corrective action report.  Id. Ex. 12.  Koehler also warned Johnson about improperly verifying specimens and making a comment about an employee/patient's hair loss that upset that person; Koehler also warned her about repeated tardiness.  Id.  Ex. 14, 15.

Johnson cites two incidents from this time that she regards as racially motivated.  First, Koehler came into a room where several employees were standing together and accused Johnson, the only African-American present, of making a mess in one of the work rooms, and demanded that she clean it up immediately.  Johnson Dep. 31-32.  Koehler never asked who caused the messy room, and, after Johnson told her she was not responsible for the mess, Koehler never apologized to her for the error.  Id.

Second, Koehler, Johnson, and a phlebotomist named Taina were sitting at the label counter, and Taina asked Koehler whether she could move to full-time status.  Id. at 33.  Koehler said St. Luke's did not have any full-time openings, then turned to Johnson and said "unless Annette, you want to give up your job," and laughed.  Id.

On the morning of August 10, 2005, Johnson and Suriano

clashed again.  Def. Mem. Ex. 16.  That day, Johnson said "Good Morning" to Suriano and, based on this, Suriano and other employees who witnessed the event complained to Koehler that Johnson had threatened and intimidated Suriano.  Id; Johnson Dep. at 27.  Johnson denied that she did anything but greet Suriano, and stated that the other employees were lying about the incident to get Johnson fired so that Taina could get a full-time position.  Id.  Koehler wrote a corrective action report about Johnson that put her on third warning probation based upon the incident.  Id.

On October 12, 2005, Tanya Markovich (a Human Resources Generalist at St. Luke's), McKellin, Koehler, and Johnson had a meeting about Johnson's feeling that she was singled out because of her race.  Id. Ex. 17; Johnson Dep. at 70.  At the end of the meeting, everyone agreed that Koehler's disciplining of Johnson would occur behind closed doors and that if any of Johnson's co-workers acted inappropriately towards her, she would communicate with Koehler directly about it.  Id.

On December 28, 2005, Johnson and co-worker Daisy Morales had an altercation.  Id. Ex. 18.  Johnson had picked up one of Morales's labels and Morales had picked up one of Johnson's.  Johnson Dep. at 59-60. After this happened, Morales

began screaming at Johnson and calling her derogatory names in Spanish, e.g., "puta," which means whore.  Id.  Johnson claims she did not respond in kind, but calmly told Morales that Morales was obviously upset and she should go talk to someone.  Id. Koehler investigated the incident, and on January 17, 2006 wrote a corrective action report about Morales that found that Morales had raised her voice, used profanity, and fought with a co-worker in St. Luke's.  Def.'s Mem. Ex. 29.  On the same day, Koehler and McKellin suspended Johnson with the intent to terminate.  Id. Ex. 18.

In a letter two days later, Andrew J. Seidel, Vice-President of Human Resources for St. Luke's, officially terminated Johnson.  Id.  The letter outlined every incident of corrective action or written reprimand Koehler had given Johnson since she started in the phlebotomy department.  Id.  According to the letter, Johnson raised her voice during the altercation with Morales and pointed to her rear and said, "check this."  Id. The letter also stated that after the incident, Johnson had a conversation with another employee in which she stated that she could understand why people come back to their workplaces with guns and shoot co-workers.  Id.  Johnson hotly denied that either of these events occurred the way Koehler reported them.  Johnson

10

Dep. at 59-62.

On May 2, 2006, Johnson filed her original complaint against St. Luke's in the Court of Common Pleas of Lehigh County. On August 2, 2006, St. Luke's removed the case to this Court based on federal question jurisdiction.  Johnson filed an amended complaint on August 25, 2006, in which she alleged St. Luke's had discharged her because of her race, violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981.  Compl. ¶¶ 34, 40.  After discovery, St. Luke's moved for summary judgment.

## II.  **Analysis**[4]

---

[4]  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Liberty Lobby, 477 U.S. at 255.

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  Trap Rock Indus., Inc.

Johnson alleges violations of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u>, and 42 U.S.C. § 1981.  Compl. ¶¶ 34, 40.  For the purposes of a claim of race-based discharge from employment, the legal standard for a Section 1981 claim is the same as that for a Title VII claim because one statute's protection is co-extensive with the other's.  <u>see, e.g.</u>, <u>Bullock v. Children's Hospital of Philadelphia</u>, 71 F. Supp. 2d 482, 485 (E.D. Pa. 1999); <u>Mason v. Ass'n for Independent Growth</u>, 817 F. Supp. 550 (E.D. Pa. 1993); <u>see also</u> <u>Lewis v. Univ. of Pittsburgh</u>, 725 F.2d 910, 915 n.5 (3d Cir. 1983).

Title VII prohibits an employer from discriminating against an individual based on his or her "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Since Johnson

---

<u>v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir.1982).  It is not enough to discredit the moving party's evidence, the non-moving party is required to "present <u>affirmative</u> evidence in order to defeat a properly supported motion for summary judgment." <u>Liberty Lobby</u>, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

12

neither avers nor presents any direct evidence of discrimination, her claims are subject to the familiar burden-shifting analysis of <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981). Under this approach, the plaintiff must first prove a <u>prima facie</u> case of discrimination.   <u>McDonnell-Douglas</u>, 411 U.S. at 802; <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).  If the plaintiff succeeds, then the burden shifts to the defendant to "articulate some legitimate, non-discriminatory reason for the employee's [discharge.]" <u>McDonnell-Douglas</u> at 802.  Then the burden shifts back to the plaintiff to show the reason proffered is a pretext for discrimination.  <u>Id.</u> at 804.

### A.   The <u>Prima Facie</u> Case

To establish the <u>prima facie</u> case, Johnson must show that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination.  <u>See</u> <u>Burdine</u>, 450 U.S. at 254 n.6; <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 410-11 (3d Cir. 1999).

The first three elements are not in dispute.  Def.'s

13

Mem. at 10.  Johnson is an African-American woman, race is a
protected class under Title VII, and therefore she is a member of
a protected class.  St. Luke's admits she was qualified to hold
her position.  Id.  Johnson suffered an adverse employment action
when St. Luke's fired her.  Only the fourth element remains for
consideration.  Id.

A plaintiff can make out an inference of discrimination
in a variety of ways.  Based on her brief, Johnson has elected to
show this element by establishing "more favorable treatment of
similarly situated colleagues outside of the relevant class."
Bullock, 71 F. Supp. 2d at 487; see also Pivirotto v. Innovative
Sys., Inc., 191 F.3d 344, 356-57 (3d Cir. 1999); see Def.'s Mem.
at 8.  It is not necessary, however, for Johnson to show such
treatment to establish the fourth element.  Id. at 489;
Pivirotto, 191 F.3d at 357.  Rather, she must establish "some
causal nexus between [her] membership in a protected class and
the decision to [terminate her employment]."  Sarullo v. U.S.
Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003).

Johnson contends that an inference of discrimination
arises from seven events.  See Pl.'s Mem. at 8-10.

> 1.   Koehler wrote up Johnson for
>      speaking inappropriately to Suriano
>      when Koehler knew Johnson did not

14

do so. <u>See</u> Pl.'s Mem. at 8; Johnson
Dep. at 22-23, 30-31.

2.   Koehler wrote up Johnson for
     tardiness while she did not write
     up employees of other races for
     tardiness.  <u>Id.</u> at 9; Johnson Dep.
     at 36-37.

3.   Koehler wrote up Johnson for eating
     in the work area, while a European-
     American employee who always had
     coffee in the work area was never
     written up.  <u>Id</u>; Johnson Dep. at
     37-38.

4.   Koehler did not give Johnson the
     day-shift hours she requested
     despite Johnson's seniority, but
     did give those hours to employees
     of other races.  <u>Id</u>; Johnson Dep.
     at 44-45.

5.   Koehler wrote up Johnson for
     failing to fill certain tubes
     properly, while Koehler knew these
     tubes were part of a defective
     batch sent to the phlebotomy
     department.  Koehler did not write
     up anyone else for using the
     defective batch of tubes.  <u>Id</u>;
     Johnson Dep. at 47-48.

6.   Koehler accused Johnson of creating
     a mess in one of the workrooms
     without making an effort to ask the
     other employees who were present
     whether Johnson or some other
     person was actually responsible for
     the mess.  Then Koehler demanded
     that Johnson, the only African-
     American in the room, clean up the
     mess.  <u>Id</u>; Johnson Dep. at 31-32.

15

    7.    Koehler wrote up both Johnson and
            Morales, when Morales yelled at and
            berated Johnson in front of
            patients and other co-workers,
            while Johnson did nothing to
            warrant such reaction and kept calm
            throughout. <u>Id.</u> at 10; Johnson
            Dep. at 59-61.

Of these seven sets of facts, only events 1, 6 and 7 are wholly

based on evidence in the record.  Events 2, 3 and 4 are based on

speculation.  Johnson had no personal knowledge of any corrective

actions or reprimands given to other employees, and she offers no

other evidence that supports these allegations.[5]  <u>See</u> Johnson

Dep. at 64.  Similarly with respect to event 5, Johnson points to

<u>no</u> evidence in the record supporting her assertion that anyone

else was written up for using defective tubes.

      We will not consider unsupported speculation at this

late stage of the litigation, <u>see</u> <u>Trap Rock Indus., Inc. v. Local</u>

<u>825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of</u>

<u>Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir. 1982), and thus

---

     [5]  Despite a thorough search, we find nothing in the record
to support Johnson's claims.  In the course of our search -- one
that we were not obliged to take -- we were surprised that
Johnson actually named several people who might have been willing
to corroborate her story, <u>e.g.</u>, Debbie Littles, Adrien Steckel,
and Michelle Bahler.  Johnson Dep. at 43, 59-60.  Yet her counsel
did not include testimony from any of these, or any other,
individuals.

events 2, 3, 4 and the relevant part of 5 cannot survive a summary judgment motion.

The remaining four events do not support the fourth element for a prima facie case.  Events 1, 5, and 7 are all supposed instances of St. Luke's unjustifiedly writing up Johnson.  None of these events points to race as the motivating reason for her termination.  Johnson has identified no evidence of record that suggests that any other employee, white or otherwise non-black, was treated differently.  In fact, St. Luke's presents uncontradicted evidence that every person involved in an incident with Johnson was either written up or reprimanded.  Def.'s Mem. Ex. 8, 22, 29.

Only event 6 -- the mess in the workroom incident -- read in the light most favorable to Johnson could, in theory, allow one reasonably to infer that race may have played a part in her termination.  But this alone is insufficient to establish the fourth element of the prima facie case, which requires the plaintiff to establish a "causal nexus" between the racial animus and the adverse employment action.  Sarullo, 352 F.3d at 798.  Assuming, as we must, that event 6 is probative of racial animus, Johnson must still link it with the decision to terminate her employment.  Without such a link, Johnson cannot establish even a

17

tenuous causal nexus between her termination and Koehler's
putative racial animus.  Since Johnson has not established <u>any</u>
causal nexus between racial animus and the decision to terminate
her, she has not made out a <u>prima</u> <u>facie</u> case, and we must dismiss
her claim.

### B.   Pretext

Even if Johnson did establish a <u>prima</u> <u>facie</u> case, her
claim would still fail because she cannot point to anything in
the record that suggests that St. Luke's proffered reason for her
termination is pretextual.

Assuming Johnson were able to make out a <u>prima</u> <u>facie</u>
case of discrimination, St. Luke's has an opportunity to offer a
legitimate, non-discriminatory reason for its decision to
terminate Johnson.  <u>McDonnell-Douglas</u>, 411 U.S. at 802; <u>Hicks</u>,
509 U.S. as 506.  St. Luke's officially fired Johnson because she
had "shown that [she was] either unwilling or unable to comply
with St. Luke's standards of performance/customer service
expectations and [her] behavior clearly demonstrate[d] a pattern
of repeated failure to interact appropriately with [her] co-
workers."  Def.'s Mem. Ex. 18; <u>see</u> <u>also</u> Def.'s Mem. at 22.

Once St. Luke's has articulated a legitimate reason,

the burden returns to Johnson.  McDonnell-Douglas, 411 U.S. at 804.  Johnson must now point to evidence -- circumstantial or direct -- from which a reasonable fact-finder could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Under the Fuentes test, the evidence plaintiff proffers must meet a heightened "level of specificity" to survive summary judgment.  Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998).  If the plaintiff satisfies either prong of the Fuentes test, she survives summary judgment.  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)

A plaintiff can satisfy the Fuentes test by showing that the "proffered reasons are weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could rationally find them unworthy of credence."  Sarullo, 352 F.3d at 800 (quoting Keller, 130 F.3d at 1108-09) (internal quotations omitted).  Put a different way, Johnson could show "that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  Jones v. School Dist. of Philadelphia, 198 F.3d 403,

19

413 (3d Cir. 1999) (quoting <u>Keller</u>, 130 F.3d at 1109) (internal quotations omitted).  Though the precise distinguishing characteristics of "plainly wrong" may not be pellucid, one thing is clear:  at this point in the <u>McDonnell-Douglass</u> burden shifting, the plaintiff must do more than simply point at the defendant's proffered reason and say it is a lie.

Here, Johnson presents <u>no</u> new evidence to show pretext, and relies solely on the same facts she presented at the <u>prima facie</u> stage.  Pl.'s Mem. at 15-16.  Johnson rests on her assertions that the incidents with co-workers were not properly written up, and that she did not behave as Koehler wrote.  <u>Id.</u> At this stage of the analysis, Johnson must do more than simply deny the truth of St. Luke's proffered reason; she must come forward with Rule 56 "specific facts" to support her pretext theory.  <u>See</u> Fed. R. Civ. P. 56(e).

Alternatively, Johnson could satisfy the <u>Fuentes</u> test by "identify[ing] evidence in the summary judgment record that allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  <u>Keller</u>, 130 F.3d at 1111 (quoting <u>Fuentes</u>, 32 F.3d at 762) (internal quotations omitted).  This amounts to re-establishing the fourth prong of the <u>prima facie</u>

case, but with greater specificity.  See <u>Simpson</u>, 142 F.3d at 646.

A plaintiff cannot establish pretext sufficient to survive summary judgment when relying on only one instance of disparate treatment that contained no overt racial character. <u>Nichols v. Bennett Detective & Protective Agency, Inc.</u>, 2007 WL 2421813, at *5 (3d Cir. Aug. 28, 2007).  <u>Nichols</u> is rather instructive to Johnson's case.

In <u>Nichols</u>, plaintiff was an African-American woman who worked as a security guard and supervisor for defendant for three years.  <u>Id.</u> at *1.  One day, plaintiff and a white subordinate got into a fight, apparently at the premises of the employer's client.  <u>Id.</u>  The employer removed plaintiff from her post, but did not remove the subordinate.  <u>Id.</u>  When the employer failed to assign plaintiff to a full time post, she resigned.  <u>Id.</u> Plaintiff sued her employer on claims of race and gender discrimination.  <u>Id.</u>  The employer stated that it removed the plaintiff from her post in order to placate a displeased client who wanted the plaintiff off its premises.  <u>Id.</u> at 5.  Plaintiff offered the fact that she was removed, and her white subordinate was not, as the only evidence that the proffered reason was a pretext.  <u>Id.</u>  The district court granted the defendant summary

21

judgment because plaintiff failed to establish that defendant's proffered reason was a pretext.  Id.  Our Court of Appeals affirmed, and stated that the plaintiff only offered a "single occasion" of disparate treatment that "had no overt racial or sex-related content" to undermine defendant's proffered reason, and this was insufficient to satisfy either prong of the Fuentes test.  Id. at *5.

Here, Johnson relies on the same seven events she did at the prima facie stage, and these events suffer from the same defects they did in that context.  Johnson provides no support for her assertion that white employees were treated differently when it came to tardiness, eating, and getting day shift hours; rather, she simply asserts this was the case.  See Johnson Dep. at 36-38, 44-45.  Bald speculations simply will not do on summary judgment.  See Trap Rock Indus., 982 F.2d at 890; DuFresne, 676 F.2d at 969.

Of the four events that remain, three are instances of allegedly unjustified corrective actions or reprimands.  Johnson Dep. at 22-23, 30-31, 47-48, 59-61.  The three allegedly unjustified write ups do not establish disparate treatment because Johnson points to no evidence in the record that establishes that any employee of a different race was indeed

22

treated better or differently than she was.  As we pointed out earlier, the employment files in the record demonstrate that after every incident in which Johnson was involved, the other participant was either written up or reprimanded. See Def.'s Mem. Ex. 8, 22, 29.

The only remaining event of disparate treatment in the record was when Koehler singled out Johnson -- the only African-American in a small group of employees -- to go clean up a room she claims she had not dirtied.  Johnson Dep. at 31-32.  Just as in Nichols, this amounts to a single occasion of disparate treatment that on its face shows no overt racial content.  See Nichols, 2007 WL 2421813, *5.  This is not sufficient at the summary judgment stage to establish that St. Luke's proffered reason for Johnson's termination is a pretext.

The general problem with Johnson's claim can perhaps best be gleaned from an excerpt of her deposition testimony:

> I mean what else can I say other than race?
> I know she did it because I'm black.  What
> other reason why she would do it [sic]?
> There is no -- because she doesn't like me?
> No, I don't think so.  Why doesn't she like
> me?  Because I'm black.  I'm an African
> American black woman and that's why.

Johnson Dep. at 39.

Johnson certainly has presented evidence sufficient to

23

justify drawing the inference that Koehler did not regard Johnson as a stellar employee, but she has failed to establish the further, crucial inference that Koehler did not like Johnson because she is black.  Without presenting affirmative evidence, either circumstantial or direct, of a racial link for Koehler's animus, Johnson's unsupported belief that race motivated Koehler's decision cannot establish the requisite inference that St. Luke's proffered reason is a pretext for invidious discrimination.

We will therefore grant St. Luke's motion for summary judgment.


BY THE COURT:



/s/ Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANNETTE JOHNSON                 :   CIVIL ACTION
                                :
           v.                   :
                                :
ST. LUKE'S HOSPITAL             :   NO. 06-3417

<u>ORDER</u>

AND NOW, this 23rd day of October, 2007, upon consideration of defendant St. Luke's Hospital's motion for summary judgment (docket number #20), plaintiff Annette Johnson's response, and the reply thereto, it is hereby ORDERED that:

1.   St. Luke's Hospital's motion for summary judgment is GRANTED; and

2.   The Clerk of Court shall CLOSE this case statistically.

BY THE COURT:


<u>/s/ Stewart Dalzell, J.   </u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANNETTE JOHNSON            :  CIVIL ACTION
                           :
         v.                :
                           :
ST. LUKE'S HOSPITAL        :  NO. 06-3417

<u>JUDGMENT</u>

AND NOW, this 23rd day of October, 2007, in accordance
with the accompanying Memorandum and Order, and the Court having
this day granted defendant's motion for summary judgment,
JUDGMENT IS ENTERED in favor of defendant St. Luke's Hospital and
against plaintiff Annette Johnson.

BY THE COURT:


/s/ Stewart Dalzell, J.